19-2899 from the District of Minnesota, George Amador v. 3M Company et al. Court will hear from Mr. Sackett. May it please the court and counsel, Michael Sackett on behalf of Mr. George Amador and more than 5,000 other plaintiff appellants. The district court erred as a matter of law in excluding the general causation opinions of three of plaintiff's medical experts, Dr. Samet, Dr. Jarvis, and Dr. Stonington, who each opined that the bear hugger, a patient warming device manufactured by 3M, can cause deep joint infection in ultra clean orthopedic surgeries. In this circuit, expert testimony may be excluded, quote, only if it is so fundamentally unsupported that it can offer no assistance to the jury, end quote. This court's decisions, including Judge Grunder, your decision with Judge Murphy and Inres Zern from 2011, as well as the 2005 decision that you authored in Nebraska Plastics, along with more recently, Judge Graz, your decision in Klingenberg from 2019, all recite the fundamentally unsupported standard as the law in this circuit for when an opinion may be excluded. Here, the district court properly cited, properly applied that standard in its first order from December of 2017 and admitted the causation testimony of plaintiff's three medical experts. That can be seen at the addendum on page 56, citing children's broadcast. However, in July of 2019, the district court radically reversed itself, not citing the fundamentally unsupported standard when reviewing plaintiff's medical causation expert testimony. Instead of citing that permissive standard, the court instead elevated that standard to one of conclusive evidence of causation, which violated rule 702's presumption of admissibility, as well as the standard of a preponderance of the evidence, not correctness. Indeed, Judge Kelly, in your decision in Adams, you expressly wrote that expert opinions need not be based on scientific absolutes. The district court's error is second page of its decision at the addendum page four, where the court. Counsel, I have a question about the district court's shift in view on this issue. What do you think was the key evidence or testimony that came out at the trial that prompted this change? Or what additional evidence do you think was proposed that made the difference? That goes right to the heart of the issue, Your Honor. In plaintiff's perspective, there was no shift in the evidence to justify this radical reversal. There was a change in the standard that the court applied. When 3M moved for reconsideration, the district judge authorized them to move on three pieces of evidence. The first, an in limine ruling in one bellwether case that could not expand to the MDL as a whole. Two, the 2018 gene study, which didn't involve the bear hugger and did not expressly and only involve deep joint infection. 3M's own epidemiologist, Dr. Borak admitted that that study could not disprove the McGovern study. And third, El-Ghobashi's trial testimony. Nothing that El-Ghobashi testified to at the Garris trial changed the results of his published and peer-reviewed study that is now in one of the world's most preeminent journals as evidence of the fact that the bear hugger increases particle pollution over the sterile field and therefore corroborates the undisputed chain of infection in this case, which distinguishes this case from joiner or glass fetter when there wasn't even a mechanism of infection to correlate parladel to vasoconstriction much less intracerebral hemorrhages. So here the district court shift was a legal one. It went from one order applying fundamentally unsupported standard to another, elevating that burden of proof to a standard that this court has never applied. Indeed in Kuhn, decided by Judge Duwamant and Judge Grunder, that court reversed the exclusion of general causation testimony for the same reason that this court should do so here. There the expert testified that Prempro could cause breast cancer based on short-term use. There were studies supporting that opinion. Nonetheless, the panel reversed because even though some of the studies were not perfect and had important limitations, that didn't mean that exclusion was proper. In fact, in that case... Counsel, I'm sorry to interrupt, but we do have limited time. I do have a question. Can you tell me what the strongest evidence is for the causation between the bear hugger use and an increased level of contamination at the surgical site? Because isn't that sort of the location? So there's a number of ways to approach the question, Your Honor. The first is the McGovern study is the epidemiologic evidence that bear hugger increases the risk of actual infection. Whether we want to be talking about particles or bacteria, that study found a 380% increased risk as a result of the bear hugger. If we're talking about a finding dealing with which expressly found that bear hugger significantly increased the amount of bacteria at the sterile field. Even 3M's own epidemiologist admitted that it was reasonable to conclude that the internal contamination of the device could cause infection. So when you say the sterile field, is that the same and forgive me for not knowing this, but is that the same as the surgical site? The surgical site is the area, the wound would be the actual opening of the person's hip or knee. And to give some color to this, in 2016, Darush et al conducted a randomized controlled trial, the gold standard of scientific evidence. In that study, the authors correlated particles to bacteria to infection. So when there are particles in the sterile field, even if they're not on the joint, that increases risk. Counsel, you've talked in general terms about this, but could you address more specifically the alleged gaps in the airflow studies by Dr. El-Ghubashi in terms of the alleged failure to include other causes of airflow disruption in those studies? Of course, Judge Graz. Dr. El-Ghubashi's study was a general mechanism study to demonstrate whether the bear hugger, the bear hugger itself has the ability to increase particles over the sterile field. That is why El-Ghubashi isolated that variable. Indeed 3M's own expert, Dr. Abrams did the exact same thing. And in shock, an opinion Judge Grunder that you joined, the court wrote that it was disingenuous for one party to attack the methodology of another party based on the same what all the published and peer-reviewed studies do, which is to isolate the variable at issue, which was the bear hugger and determine whether the bear hugger can cause particles over the sterile field. And this was for general causation, not specific causation, general causation. Had it been a specific causation study, then yes, some of the other variables should be accounted for. But for general causation, the variable itself needs to be isolated and determined just like El-Ghubashi's own expert did. Wasn't it fair for the district court though to say that when he was asked about real world conditions, real surgical conditions, that he was just speculating at that point? Dr. El-Ghubashi, in terms of whether he offered an opinion that was speculation, that went to whether the other variables would exacerbate or exaggerate the effect of the bear hugger. So even assuming arduendo that that aspect of Dr. El-Ghubashi's opinion was ipsodixit, which it wasn't because both the McGovern study and the Bolani study both held that magnification occurs from staff movement and other variables in the field. Simply that small part of Dr. El-Ghubashi's opinion could be stricken in the whole remaining part about his CFD simulation that was published and peer-reviewed. And again, one of the preeminent journals in the world would go through and allow the jury to at least understand this is what the bear hugger can do regardless of other variables in the operating room, whether or not those variables exacerbate or do not. Some of the other evidence here, in addition to Dr. El-Ghubashi's study, which the district court at page two found supported plaintiff's opinions. So again, at page two, the district court found El-Ghubashi's study and the McGovern study supported plaintiff's expert's opinions. Nonetheless, it didn't allow plaintiff's experts to rely on them because of a purported analytical gap. But here, plaintiff's experts cited epidemiologic evidence and mechanistic evidence to bridge the gap from the association to causation. Is there a study that shows that particles admitted by the bear hugger actually reached the surgical site? And if so, which one? So the Bolani study, the Legg study, the McGovern study, they all show that particles are in the sterile field and the surgical site. In terms of a bug actually getting into the patient, there is the Moretti study showing bacteria in the buckets right by the patient. And there's also the Bernard study, which was a 2009 case. Did any of those show that the particles were in the surgical site? The theory, okay, so as to the internal contamination theory, I think, is what, Judge Grunder, you're asking from the bear hugger itself. The Bernard study expressly linked the bear hugger's internal contamination to an outbreak of infection, specifically acinobacter bomeni. And the authors of that study held that it was the causative factor. And we see other published studies citing Bernard's for that very proposition. Beavers said the bear hugger is a reservoir of infection based on prior outbreaks. The 2009 Albrecht study that 3M put in its own appendix cites Bernard's for the proposition that the bear hugger was the causative factor of those outbreaks of infection. So yes, there even are studies directly linking this device to infection. But again, the district court, despite plaintiffs citing that study throughout this litigation, throughout raising it at the oral argument, disregarded it and refused to acknowledge it in the order, which is plain error, abusive discretion to not consider the evidence. Counsel, because of the shortness of time, I was wondering if you could address your unjust enrichment and consumer protection claims and whether those claims are viable in the absence of the medical causation experts. I will try to address them very quickly, Judge Graves. As to unjust enrichment, unjust enrichment does not require causation as an explicit element of the claim. And in Ray Viagra, a district court decision, the court stated as much. However, there, the district court found that the claim still failed because there was no other reason why the defendant would have been unjustly enriched. Here, plaintiffs maintain that whether or not there could be causation as to the harm that they suffered, there was still unjust enrichment because there's no evidence whatsoever that the bear hugger has any impact on decreasing infection for orthopedic patients. Therefore, there was unjust enrichment given that lack of benefit. And as to the remaining claims for consumer protection, we would rest on our briefs and I would like to reserve the rest of my time for rebuttal if possible. Very well. Thank you, Mr. Saket. Thank you. Court will hear from Mr. Van Oort. Good morning, Your Honors. May it please the court. The district court's meticulous 49-page opinion shows exactly what a gatekeeping analysis should look like. It focused on reliability, applying the factors that the Supreme Court in Joyner and this court in Glasteader and other cases have identified. It considered the evidence both specifically and in totality. It didn't set bright lines but recognized that the analysis is flexible and ultimately, after four days of Dawbert hearings and 12 days of a bellwether trial and more than a thousand pages of briefing, it concluded that the experts' opinions were unreliable and it therefore excluded them. Summary judgment then followed as a matter of law. I would like to get into some of the legal things right away that Mr. Saket claimed. First of all, his opening claim that the district court did not cite the so fundamentally unsupported language in its opinion, the opinion excluding. That's just plain wrong. It quotes it at addendum page 21, acknowledging this court's Bonner case. So his lead point was just wrong. The second point on this is Your Honor asked what changed from the first one to the second. What changed is there is the bellwether trial in Garris and two of experts made admissions there that were really significant. Dr. El-Ghobashi in his report had claimed that he was going to show a 10 micron particle actually getting to the incision, but at the trial it was undisputed that it showed that it didn't. Dr. Abraham pointed it out and nobody rebutted it. So that was big. The more significant thing with Dr. El-Ghobashi though is at trial, he admitted he hadn't modeled physicians moving and he hadn't modeled the is that he admitted those are actually the biggest sources of turbulence. The district court in its opinion discussing Dr. El-Ghobashi cites both in the text and in her footnote two studies showing that the biggest effect on turbulence is people moving in door openings. Dr. El-Ghobashi didn't address those. He admitted he did. He admitted he could have, but he said he didn't because plaintiff's counsel didn't ask him to. That was a really big change. The other really big change was the testimony of Dr. Jarvis. At trial, Dr. Jarvis admitted two things going to the gaps that your honors have asked about. Number one is to the dirty machine theory. He admitted that there's no study, and this is true, there's no study showing that particles of the size of this come out of the blanket, let alone reach the surgical site. So there are two gaps there, and Dr. Jarvis admitted those at trial on that. Then the third thing that happened, your honors, is the 2018 International Consensus came out and examined these same studies, including McGovern. One of the authors of the 2018 consensus was Dr. Reed, who was a co-author of McGovern and who plaintiffs cite all the time. The 2018 consensus looked at all of this and said there's just a gap here. We don't find it scientifically unsupported. Your honors, this really gets to the core of what makes this case different. I'm not aware of any other case in the Daubert context like this where the FDA has directly considered the same evidence and found it unsupported. So in 2012, when Augustine was making these false advertising claims, the FDA sent him a letter saying, he was relying on you haven't identified a clinically supported contrast here. Then he kept doing it, and in 2017, the FDA sent its letter to healthcare providers. It seems almost unprecedented saying, hey, we know there's a lot of noise about this. We've looked at it closely. There's no consistent association here. Please keep using the forced air warming because it helps patients on that. I'm not aware of any other Daubert situation in which that happened on there where the same gaps that the district court found were reinforced by FDA and by the international consensus on this. Counsel quotes and claims that the Moretti study supports them. They made the same claim, your honor, in this chart at the beginning of their reply brief that has all these studies. I want to do this because this is particularly untrue to the record. The quote, this is at page five of their reply brief, this is in their chart, their quote about Moretti, which he repeated this morning, is that in the 20 procedures in which the bear hugger was used, the mean bacterial load values were significantly increased. That's where they end their quote. That's not the end of the sentence. The end of the sentence says it's increased compared to at rest conditions, meaning an empty operating room. So the levels were increased with the bear hugger over an empty operating room. The same study shows that the levels decreased versus a patient on the table. So the bacterial levels were higher with the patient on the table, went down when the bear hugger was turned on. So here's the punch line from Moretti that they don't acknowledge. This is the conclusion of the study. I'm reading, quote, the results demonstrated that the bear hugger system does not pose a real risk for nosocomial infections. That's what Moretti actually says. The important numbers about this chart in their reply brief are zero, one, and four. Zero is the number of studies outside this litigation that have agreed with them on not a single medical organization has agreed with them on causation. Counsel, is that absolutely necessary? It seems to me that the scientists could look at an array of studies and put together the theory for then the jury to determine whether this actually was a cause. I wonder if you have to have an express study establishing causation before you go into the trial. No, there's no bright line rule that says that, Your Honor. There are other things that could be put together. Epidemiology and others could. And the district court didn't disagree, by the way. The district court agreed, this is at page addendum 19 of her opinion, that expert testimony inherently involves some amount of guesswork. And she never said a bright line rule that said you need to have causation. What she recognized, though, is the same thing that the scientific reference manual says, which is that when you're relying on correlation and then going from there, you've got to consider alternatives and you've got to recognize the difference. Sometimes a correlation can be causative. Sometimes it can't. It depends. And you've just got to do the analysis. And to that point, this is something that she found important that the scientific reference manual agrees. And we cited this. The rule from legitimate epidemiology is that rarely, if ever, can a single study persuasively demonstrate a causal relationship, a single epidemiological study. And the reason is that it doesn't control for other factors. And what it says is that you want to have multiple studies with multiple different researchers, multiple bodies, so that you're confident that you're ruling out alternative causes. Reference manual says that at page 604. And, of course, here there's only McGovern, which had all these flaws. I know that the plaintiffs have tried to minimize the flaws, but the really big problem here goes right to what the scientific reference manual says and what Dr. Reed, who's one of the authors, acknowledged. The scientific reference manual says the real Achilles heel of observational studies like this, not controlled studies, is that you may get different populations coming in that are a different explanation. And Dr. Reed acknowledged this. He said in McGovern, we didn't have the data to track for these really important factors, including obesity and incontinence and fitness for surgery and blood transfusions. And these are significant predictors. So he said, we just can't rule that out. So when you had the single study here, that's the real problem. Mr. Saket got up and said something in argument this morning that they said in their reply brief that, again, is just not correct. And he said, because this is general causation, the experts didn't have to rule out alternative causes. There's no support for that. When they say that in their brief, the only two things they cite are definitions of general cause and specific cause. And the scientific reference manual makes it really clear that in a situation like this, where everybody acknowledges that infections can have so many different causes, of course you've got to rule out the other ones to from the bear hugger system. I want to address two more things. Your Honor asked whether there's any study showing that particles from the bear hugger actually got into the incision. The answer to that is no. Mr. Saket wasn't able to cite one. It's not there. More importantly, the studies that most directly examine whether the bear hugger causes infections, they've all come out the other way. The 2018 consensus, Your Honor, is really a great summary of this. 3M appendix page 351 just has a really one-page summary of the current science that's really useful to get your arms around this. But the other part in this is, and this is, you know, the district court knew this, too, because it had three years to figure this out. When the authors that the plaintiffs rely on actually looked for bacteria instead of just particles or bubbles, when they actually looked for bacteria, they couldn't find any linked to the bear hugger. They didn't find a statistically significant connection. I'm going to read from what Dr. Reed found and what Mark Albrecht found and didn't report publicly when they were doing their particle studies. Here's the conclusion in an internal document they prepared for Augustine. Conclusions. Use of forced air warming devices does not increase the bacterial count in the vicinity of the operative field. That's page 3M, appendix 234. Mark Albrecht looked for bacteria a number of times and admitted he couldn't find anything significant. We cite that in our brief at page 24. Are you saying that there are no studies that show that there's an increase in the bacterial load or the contaminants in the area of the surgical site based on bear hugger? There's none? Yeah, let's be clear about the surgical site in the vicinity. When they cite the bacteria, there's nothing showing bacteria right around the surgical vicinity. I think that's correct, Your Honor. There's none showing that particles get there. That's what the Dr. Elgobashi said. I want to just flip through here and make sure. What did the study show? We're kind of using different terminology, so let me ask it this way. What studies show how close the bacteria does get the contaminants? How close are they? Yeah, Your Honor. When the studies do bacteria counts, they have a number of different locations depending on whether the studies. Some of them place like an agar plate, the petri dish on the chest and various locations around there. It's hard to generalize on that, Your Honor. No study has shown a significant increase in bacteria in any of those with the bear hugger on that. That significance isn't there. Like I said, the most recent best controlled study is called OGUS. It's summarized in the 2018 consensus. It was actually a clinically controlled random study that compared bear hugger and electric blankets head to head. It randomly selected the patients it controlled for all of that. It found no statistically significant difference on that. I want to make sure that I address the Bernard's paper that counsel referenced to because they've referred to that a lot. Bernard's doesn't involve joint infections and it doesn't involve staphylococcus and it's not an observational study. It was a single case report that came out of the Netherlands. What happened is they had two outbreaks of Acinetobacter, a special antibiotic resistant thing. There are two separate outbreaks. In the first outbreak, 28 people got lung infections from this Acinetobacter. When they tested to find where it had come from, they found that it was found both in a ventilator and then in filters in a bear hugger. That was lung infections in a ventilator. It's pretty clear there. The abstract linked it to that. There was a second outbreak. In the second outbreak, it was linked to a machine that is an alternative to dialysis, a continuous venous dialysis machine. That one is the only one where there is a hip infection, but they didn't have anything to the bear hugger there. I would like to briefly turn to the consumer protection claims. I'm assuming there are a lot of laws that would apply to these claims. Can you tell us why, even in the absence of the medical causation experts, those wouldn't need to be decided on a case-by-case, state-by-state basis? Yes, your honor. Causation, we addressed this in our brief too. Causation is an element of every one of the consumer protection claims. Ultimately, there's got to be a cause between the alleged wrong and the injury. The laws say it in a variety of different ways, but they all contain that. Plaintiffs didn't go through and prove otherwise. Here, the only mechanism of harm, it wasn't a misrepresentation theory anyway. The consumer protection claims aren't a very good fit. The only theory was that this causes infections. If there's no submissible proof that it causes infections, the claims can't proceed, your honor. I just want to say, the district court has been as thorough as this one and as careful and as patient. When the only flaws that the district court finds are the same flaws that the FDA found and that the medical organizations found, I don't see how that can be a manifest error that leads to an abuse of discretion, which is the standard review. This falls right within the core of what a careful gatekeeping analysis should do. Thank you, your honors. Thank you, Mr. Van Orn. Mr. Saket, rebuttal. Thank you very much. I'd like to hit a couple points right off the top. Mr. Van Orn suggested that I misled the court in claiming that the court did not cite the fundamentally unsupported standard in reviewing plaintiff's medical expert opinions. It did not. It cited that standard as to El Gabashi, never cited it as to the three general causation medical experts. My point is undisputed in the record, and we see that at addendums page 23 to 48, no mention of that standard on the medical experts. Second, as to the FDA, the FDA found that there was not a consistent association that did not preclude plaintiff's medical experts from applying well-established, reliable methodologies, such as the Bradford Hill criteria and using the one association, which is all that is required under the reference manual, in addition to other experimental mechanistic studies to explain the association that can bridge the gap to causation. Third, Mr. Van Orn suggested that Moretti expressly concluded that the bear hugger does not increase the risk of infection. Notably, in the appendix 3M's own at page 63, Moretti expressly states that the study was vastly underpowered, only contained 20 patients, and therefore concluded the sample size of patients was small for the calculation of statistical incidence of surgical site infection. Finally, as to the 2018 ICM, the ICM concluded that there was not definitive evidence. That is the very legal error that this district court committed in elevating the burden of proof beyond what 702 requires, as stated in Kuhn, as stated in Johnson, as stated in Lausanne, as stated in Hill, as stated in so many cases of this court, that it committed legal error in reconsidering its initial decision. At the end of the day, 3M's own 30B6 witness and lead scientist concluded in 2010 that actually the bear hugger increases the risk of infection. That closes any gap whatsoever that plaintiff's experts apparently made in this case. And at the end of the day, this district court did exactly what it did in Johnson, overstepping its gatekeeping role, invading the province of the jury, which Daubert expressly allowed the jury to resolve these kinds of disputes and therefore erred as a matter of law. Thank you very much. Thank you, counsel. We appreciate your appearance and arguments today. The case will be submitted and decided in due course.